1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 13-cr-2381 JM |
|---|---|
| Plaintiff, | ORDER DENYING MOTION TO REVOKE DETENTION |
| vs. | |
| BRIAN KARL BRIMAGER, | |
| Defendant. | |

Before the court is Defendant Brian Karl Brimager's October 14, 2014 motion to revoke the pretrial detention order entered by Magistrate Judge Gallo in June 2013.  (Doc. No. 45.)  As set forth below, the court denies the motion on grounds that Defendant is a flight risk and a danger to the community and that no condition or combination of conditions of release can reasonably assure his continued appearance in this matter or the safety of the community.

## BACKGROUND

On June 26, 2013, a federal grand jury returned the original indictment in this case.  (Doc. No. 1.)  On June 28, 2013, Magistrate Judge Gallo held a detention hearing and ordered Defendant detained pending trial.  (Doc. No. 7; Transcript, Doc. No. 45, Exh. E.)  On July 3, 2013, Judge Gallo entered a written detention order.  (Doc. No. 11.)

13cr2381 JM

1   **A.      The Superseding Indictment**[1]

2         On January 29, 2014, a federal grand jury returned the operative superseding

3   indictment.  (Doc. No. 28.)  The 13-count indictment charged Defendant with

4   (1) obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2) (Counts 1 through

5   10); (2) making a false statement to a federal officer, 18 U.S.C. § 1001 (Count 11);

6   and (3) falsification of records, in violation of 18 U.S.C. § 1519 (Counts 12 and 13).

7   (Id.)

8         The indictment contained the following allegations:  In 2009, Defendant and

9   Yvonne Baldelli began a romantic relationship.  (Id. ¶ 1.)  On September 26, 2011,

10  Defendant and Baldelli flew from California to Bocas Del Toro, Panama ("Bocas").

11  (Id. ¶ 2.)  Baldelli brought along her two high-quality sewing machines, her King

12  Charles Spaniel, and her white Sony VAIO laptop computer.  (Id.)  After their

13  arrival in Panama, the pair traveled to an island near Bocas called Isla Caranero

14  and rented a room in a hostel there.  (Id. ¶¶ 3–4.)  Their room was next to the hostel

15  manager's unit.  (Id. ¶ 4.)

16        Shortly after their arrival in Panama, Defendant began e-mailing K.W.,

17  with whom he had young daughter.  (Id. ¶ 5.)  The e-mails, which did not mention

18  Baldelli, discussed plans to move back to California with K.W. and help raise their

19  daughter.  (Id.)  Beginning around mid-October, Defendant began fighting with

20  Baldelli.  (Id. ¶ 6.)  The altercations resulted in yelling and loud noises in the

21  couple's room, and Defendant struck Baldelli, causing bruising around her eyes

22  and on her arms.  (Id.)

23        In November 2011, Defendant sent a series of e-mails to K.W., his mother,

24  and a friend from the Marine Corps indicating that he was bored with his life in

25  Panama and was planning to return to California.  (Id. ¶ 7.)  The e-mails did not

26  mention Baldelli.  (Id.)  On November 24, 2011, the hostel manager broke her leg

27  _____

28        [1] This section recounts the allegations and evidence before the grand jury.
It is not to be taken as proven.

1   and left the hostel to be treated in a hospital in another town.  (<u>Id.</u> ¶ 8.)

2       On the evening of November 26, 2011, Defendant and Baldelli went to a

3   bar and restaurant in Bocas called Carlos' steakhouse, and afterward left the bar

4   together.  (<u>Id.</u> ¶ 9.)  That night, or early the next morning, Defendant killed Baldelli,

5   dismembered her body, and disposed of her body parts in a remote wooded area on

6   the island.  (<u>Id.</u> ¶ 10.)

7       At about 10:30 the next morning, Defendant used Baldelli's Sony VAIO

8   laptop to conduct two searches, one for "washing mattress" and another for

9   "washing mattress blood stain."  (<u>Id.</u> ¶ 14.)  After Defendant could not clean the

10  mattress, he bought a new one and told the hostel manager that he had thrown the

11  old one in the ocean because his dog had urinated on it.  (<u>Id.</u>)  Later that day he

12  traveled to Bocas and withdrew money from Baldelli's bank accounts to make it

13  appear that she had traveled through Bocas on her way to Costa Rica.  (<u>Id.</u> ¶ 15.)

14  For the next two days, Defendant disposed of physical evidence of the crime,

15  including putting Baldelli's personal items in 10 large trash bags and putting them

16  on the hostel's dock for disposal.  (<u>Id.</u> at 16.)  The bags contained, among other

17  things, Baldelli's clothing, cosmetics, and jewelry.  (<u>Id.</u>)

18      On November 29, 2011, Defendant accessed Baldelli's personal e-mail

19  account.  (<u>Id.</u> ¶ 17.)  At about 9:15 a.m, posing as Baldelli, he sent an e-mail to

20  Baldelli's sister, M.V., stating that Baldelli had broken up with Defendant and was

21  headed to Costa Rica with a man named Tony Gonzales.  (<u>Id.</u>)  At around 9:35 a.m.,

22  Defendant sent two e-mails from Baldelli's account to the manager of the hostel

23  stating that Baldelli had already arrived in Costa Rica and wanted to give the

24  manager Baldelli's two high-end sewing machines.  (<u>Id.</u> ¶ 18.)  That afternoon

25  Defendant sent an e-mail from his own account to Baldelli's pretending that he

26  thought she had left Panama.  (<u>Id.</u> at 19.)

27      On December 10, 2011, Defendant flew back to the United States with a

28  layover in Costa Rica.  (<u>Id.</u> ¶ 20.)  On December 11, while still on layover in Costa

Rica, he posed as Baldelli and sent an e-mail from her account to one of her friends, stating that she was traveling in Costa Rica and "having a great time." (Id.) Later that afternoon, while still in Costa Rica, Defendant conducted an Internet search on Baldelli's Sony VAIO laptop for "Festival De La Luz." (Id. ¶ 21.) He then composed, but did not send, an e-mail from Baldelli's account to M.V. stating that Baldelli and Tony Gonzalez were having fun at the Festival De La Luz in San Jose, Costa Rica, and were planning to return to the United States in January 2012. (Id.) That afternoon Defendant visited an ATM and withdrew $200 from Baldelli's bank account to make it appear that she was alive and living in San Jose, Costa Rica. (Id. ¶ 22.)

The next day, December 12, 2011, at about 6:20 p.m., Defendant checked Baldelli's e-mail account while on a layover in Atlanta, Georgia. (Id. ¶ 23.) That night he landed in San Diego and was picked up at the airport by K.W. (Id. ¶ 24.) He proposed to K.W. two days later, and they married shortly thereafter. (Id.)

On December 13, 2011, Defendant sent an e-mail from his e-mail account to Baldelli's sister, M.V., stating that he would like to make arrangements to pick up his truck, which was parked at her house. (Id. ¶ 25.) On December 19, 2011, Defendant sent her a text following up on his request to pick up his truck. (Id. ¶ 26.) Later that day M.V. spoke to Defendant about filing a missing-persons report on Baldelli, but Defendant told her that he would first try to have Baldelli contact her. (Id.)

On December 20, 2011, at about 5:30 p.m., Defendant sent an e-mail from his account to Baldelli's account pretending she was alive and asking her to contact her sister. (Id. ¶ 27.) He copied M.V. on the e-mail. (Id.) About 30 minutes later, Defendant composed and sent an e-mail from Baldelli's account to M.V. indicating that Baldelli was fine and "missed talking to mom." (Id. ¶ 28.) The e-mail included the text from Defendant's earlier, unsent e-mail about the Festival De La Luz. (Id.)

On December 26, 2011, Defendant, again pretending to be Baldelli,

1  composed and sent an e-mail from Baldelli's account to M.V. stating that Baldelli
2  was "starting to get a little homesick" and hoped to return home in the second week
3  of January 2012.  (Id. ¶ 30.)

4      On March 21, 2012, Defendant was interviewed by FBI agents and stated
5  that Baldelli left Panama for Costa Rica on November 27, 2011; that she took her
6  Sony VAIO laptop with her when she left; that the Sony VAIO laptop he possessed
7  on March 21, 2012, had never been in Panama; that before Baldelli left Panama he
8  had not been planning to return to the United States; that he had never struck her;
9  and that he had never accessed her e-mail account or sent e-mails purporting to be
10 from her.  (Id. ¶ 31.)

11 **B.    Defendant's Motion**

12     On October 14, 2014, Defendant filed the instant motion to revoke his
13 detention.  (Doc. No. 45.)  The motion states that Defendant's wife and in-laws are
14 willing to pledge their homes as collateral for a $300,000 bond and that Defendant
15 is willing to submit to GPS monitoring and any other conditions of release.  (Id.
16 at 2–3.)  It also asserts that Defendant served honorably in the United States Marine
17 Corps for eight years and never disobeyed a lawful order.  (Id. at 2.)  His young son
18 and mother both have serious health conditions, and the loss of his income from the
19 G.I. Bill (which is not paid while he is in custody) and the added cost of childcare
20 have been hard on his family.  (Id. at 3.)  Further, he asserts, detention is interfering
21 with his  ability to assist in his own defense, as there is voluminous electronic
22 discovery that is difficult for him to review at the facility where he is being held.
23 (Id. at 5.)

24     Attached to the motion were Defendant's certificate of discharge from
25 the United States Marine Corps, redacted medical records for his son and mother,
26 his wife's resume, records related to his DUI conviction, and a  transcript of the
27 detention hearing before Magistrate Judge Gallo.  (Id., Exhs. A–E.)  Defendant's
28 military records show that he was honorably discharged, received positive reviews,

1  and was awarded numerous medals during his service.  (Id., Exh. A.)

2  **C.  The Possibility of Murder Charges**

3      On October 22, 2014, the government sought an order for an emergency

4  deposition of Baldelli's sister.  (Doc. No. 47.)  In the attached memorandum the

5  government indicated that it was seeking authorization from the U.S. Attorney

6  General to charge Defendant with foreign murder of a U.S. national, in violation

7  of 18 U.S.C. §§ 1119 and 1111.  (Doc. No. 47-1 at 2.)

8  **D.  The Government's Opposition**

9      On November 12, 2014, the government opposed Defendant's motion.

10 (Doc. No. 60.)  The government urged the court to concur with Judge Gallo's

11 detention ruling, and it offered new details on the underlying events:

12     The hostel manager's name was R.H.  (Id. at 3.)  R.H. remembers Baldelli

13 knocking on her door in mid-October 2011 and asking for a key to their room.

14 (Id. at 4.)  Baldelli was crying and upset and told R.H. that she and Defendant

15 had gotten into a fight at a local bar and that Defendant had tried to choke her

16 in the street.  (Id.)  R.H. also remembered another incident, around November 8,

17 2011, when she heard Baldelli and Defendant yelling at each other in their room.

18 (Id. at 5.)  R.H. heard a lot of banging and believed that Defendant was slamming

19 Baldelli against the wall.  (Id.)  R.H. heard Baldelli screaming in pain, and at one

20 point she heard a crash and a dog yelping.  (Id.)  The next day the blinds were shut

21 and Baldelli did not come out.  (Id.)  A later search of Baldelli's computer revealed

22 a photo of Baldelli, taken with the computer's camera and dated November 8, 2011,

23 with fresh bruising and swelling around her left eye.  (Id.)  On November 10, 2011,

24 R.H. and several other witnesses saw Baldelli and Defendant at an event in Bocas,

25 and saw that Baldelli had a severe black eye and bruises on her arms.  (Id.)

26     Around the same time, a young woman named Y.L. lived near  the hostel.

27 (Id.)  Y.L. walked by the hostel daily on a path that passed within a few feet of the

28 room Defendant and Baldelli rented.  (Id.)  One evening around the time Baldelli

went missing Y.L. heard fighting and saw Defendant choking Baldelli and dragging her into their room.  (Id. at 6.)  She heard Defendant tell Baldelli as he was choking her, "I am going to kill you."  (Id.)

Around November 26, 2011, Baldelli accessed Defendant's e-mail account and read his e-mails, from which she learned that Defendant had a child with K.W., had been in communication with her, and planned to leave Panama and return to the United States by the end of 2011.  (Id. at 6–7.)

According to Defendant, the two argued after Baldelli accessed his e-mail account and learned of his child with K.W.  (Id. at 7.)  He ordered her to leave, and she left the next morning while he was gone, taking half of her belongings with her. (Id. at 7–8.)  She left him a note that said she was "Going to Costa Rica with a man I've been talking to."  (Id. at 8.)  But in the days after Baldelli's disappearance, he told other versions of the story.  (Id.)  He told some that the man owned a yacht, and he told others that the man and Baldelli had met on the Internet or in local bars. (Id.)

Almost immediately after Baldelli's disappearance, Defendant began reaching out to socialize with others, including two women named A.B. and N.P. (Id.)  Defendant told A.B. that he was certain that Baldelli was not coming back. (Id.)  A.B. and N.P. said that they saw Baldelli buying large amounts of alcohol and cocaine, and he bragged to them that he was paying with money he had taken from Baldelli's bank account.  (Id. at 8–9.)  Money had been withdrawn from two of Baldelli's accounts on November 27, 2011.  (Id. at 9.)

The e-mails purportedly sent by Baldelli from Costa Rica on November 29, 2011, to M.V., R.H., and Defendant all originated from the same IP address on Isla Caranero, in Panama.  (Id. at 9–10.)  That IP address had been used to access Baldelli and Defendant's e-mail accounts when they first arrived at the hostel. (Id. at 10–11.)  The e-mail from Defendant to M.V. on December 20, 2011, and the purported response from Baldelli 30 minutes later indicating that she was fine, were

13cr2381 JM

both sent using an IP address that was traced back to Defendant's wife's address. (Id. at 13.)  The December 26, 2011 e-mail purportedly from Baldelli indicating that she was "starting to get a little homesick" and planned to return home in early January 2012 also originated from the IP address at Defendant's wife's address. (Id. at 14.)

On December 31, 2011, R.H. posted a machete for sale on the "Bocas Buy and Sell" Facebook page.  (Id.)  On January 4, 2012, in response to the purchaser's question about the machete's origins, Defendant posted, "It actually used to be mine . . . .  [D]on't worry, I only dismembered one stripper with it so it's hardly used." (Id. at 14–15.)

On August 21, 2013, twenty-one months after Baldelli's disappearance, human skeletal remains were found in a remote wooded area on Isla Carenero. (Id. at 16.)  Some of the remains were in a military-type duffle bag, and others were found scattered nearby.  (Id.)  Two large plastic garbage bags were also found nearby, which appeared to have been used to carry and conceal the remains. (Id.)  The duffle bag found with the remains appears identical to a bag depicted in photos recovered from computers used by Baldelli and Defendant.  (Id. at 16–17.) DNA analysis of the remains by the Panamanian medical examiner concluded that they are Baldelli's.  (Id. at 16.)  The medical examiner was unable to determine the cause of death but noted numerous cut marks on the bones and a break in the femur. (Id.)

**E.     Defendant's Reply**

On November 13, 2014, Defendant filed a reply in this matter.  (Doc. No. 62.)  Defendant urges the court to consider that the government drafted the original detention order, that the law requires the least restrictive conditions that will reasonably assure his appearance, and that there is a crucial liberty interest at stake.  (Id.)  An attached letter from his wife details his academic achievements, his community service as a youth soccer coach, his leadership in his religious

1  community, his distinctions during his service in the Marine Corps, and his

2  relationship with his wife and children.  (Id., Exh. A.)

3      **F.**    **The Detention Hearing**

4      On November 17, 2014, the court held a hearing on the matter.  (Doc.

5  No. 63.)  The parties renewed the arguments and recitations from their filings.

6  The government estimated that there is a "very high likelihood" that it will receive

7  permission to bring murder charges in the United States, (Hr'g Tr. at 15:20), and

8  that Panamanian officials will seek extradition to charge Defendant with murder

9  if he is not charged with murder here, (id. at 16:4–7).  The government also stated

10  that recent forensics have concluded that the cut marks on Baldelli's remains are

11  consistent with those made by a machete, and that a forensic anthropologist reported

12  that Baldelli's nose and teeth were "crushed in."  (Id. at 13:10–17.)

13                                  **LEGAL STANDARDS**

14      "The Bail Reform Act of 1984, 18 U.S.C. § 3141 et seq., requires the

15  release of a person facing trial under the least restrictive condition or combination

16  of conditions that will reasonably assure the appearance of the person as required

17  and the safety of the community."  United States v. Gebro, 948 F.2d 1118, 1121

18  (9th Cir. 1991).  "Only in rare circumstances should release be denied, and doubts

19  regarding the propriety of release should be resolved in the defendant's favor."  Id.

20  "On a motion for pretrial detention, the government bears the burden of showing by

21  a preponderance of the evidence that the defendant poses a flight risk, and by clear

22  and convincing evidence that the defendant poses a danger to the community."  Id.

23      18 U.S.C. § 3142(g) specifies the factors the court must consider in

24  determining whether any conditions of release will reasonably assure the

25  appearance of the person and the safety of the community:  (1) the nature and

26  circumstances of the offense charged; (2) the weight of the evidence against the

27  defendant; (3) the defendant's history and characteristics, including his character,

28  physical and mental condition, family ties, employment, financial resources, length

of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, any record concerning appearance at court proceedings, and whether at the time of the offense the person was on probation or parole; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  See id. § 3142(g). "Of these factors, the weight of the evidence is the least important, and the statute neither requires nor permits a pretrial determination of guilt."  Gebro, 948 F.2d at 1121.

A magistrate judge's detention rulings are subject to de novo review by the district court.  See United States v. Koenig, 912 F.2d 1190, 1191 (9th Cir. 1990). The district court has original jurisdiction over the charged felonies and is therefore not exercising appellate jurisdiction over the magistrate judge's decision.  See id. at 1191.  But the district court is not required to start over from scratch.  See id. at 1193.  The district court should review the evidence presented to the magistrate judge and make its own independent determination.  See id.  The district court may also hold an evidentiary hearing.  See id.  "However, there is no requirement of live testimony by the government at a detention hearing."  United States v. Cabrera-Ortigoza, 196 F.R.D. 571, 574 (S.D. Cal. 2000).  At a detention hearing the government and defendant may both proceed "by proffer or hearsay."  United States v. Winsor, 785 F.2d 755, 756 (9th Cir. 1986) (per curiam); see also Cabrera-Ortigoza, 196 F.R.D. at 573–74; 9B Federal Procedure, Lawyers Edition § 22:1852 (2014).  "The use of proffers and hearsay evidence are a necessary ingredient to the effective working of the Bail Reform Act, and prevention of a mini trial, or an early discovery expedition[,] further facilitates those goals."  Cabrera-Ortigoza, 196 F.R.D. at 575–76.  If there is a question as to the accuracy of a proffer, the court "is authorized to reconcile the demand for speed in these proceedings and the reliability of the evidence by selectively insisting on the production of evidentiary sources."  United States v. Terrones, 712 F. Supp. 786, 791 (S.D. Cal. 1989).

But, "absent something credible to challenge the reliability or correctness of the government's proffer, the Court need not compel live witnesses to testify." Cabrera-Ortigoza, 196 F.R.D. at 575.

## DISCUSSION

The court has reviewed the indictments, the transcript of the June 28, 2013 hearing before Judge Gallo, the June 2013 detention order, the parties' submissions and evidence, and the statements made at the November 17, 2014 detention hearing. As set forth below, based on those materials and the considerations required by the Bail Reform Act, the court finds that the government has shown by a preponderance of the evidence that Defendant is a serious flight risk, that it has shown by clear and convincing evidence that Defendant is a risk of danger to the community, and that no set of conditions of release can reasonably assure Defendant's presence at future proceedings in this matter or the safety of the community.

**A.      Nature and Circumstances of the Offense Charged**

18 U.S.C. § 3142(g)(1) requires the court to consider "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . ."  In this case, Defendant is charged with ten counts of obstruction of justice, one count of making a false statement to a federal officer, and two counts of falsifying records.  These are serious charges, as obstruction of justice alone carries a maximum penalty of 20 years.  See 18 U.S.C. § 1512(c)(2). The circumstances of the charged crimes involve substantial evidence, as set forth by the grand jury, of violence and deception, buttressing allegations that Defendant murdered Baldelli and attempted to cover up her disappearance by dismembering her body with a machete, dumping her remains, discarding her belongings, deceiving various acquaintances about her disappearance, and using her e-mail address and bank account in an effort to make it appear to her friends and family in the United States that she was still alive.  The prospect of up to 20 years in custody if there are convictions provides strong incentive for Defendant to flee.

Defendant has not at this point been charged with murder, but the charges implicitly require the government to prove that a murder and cover-up occurred. One thing is clear and undisputed by the parties:  in order for Defendant to be found guilty on the present charges, the government will be required to prove that it was Defendant who murdered Baldelli.  In a sense, at the very least, this case will involve an "imperfect" murder trial within the context of an "obstruction" case. Moreover, the government estimated that there is a "very high likelihood" that it will receive permission to bring murder charges in the United States, (Hr'g Tr. at 15:20), and that Panamanian officials will seek extradition to charge Defendant with murder if he is not charged with murder here, (id. at 16:4–7).  The prospect of a potential murder prosecution, either here or (perhaps worse) in Panama, provides additional strong incentive to flee.

**B.     The Weight of the Evidence**

18 U.S.C. § 3142(g)(2) requires the court to consider "the weight of the evidence against the person."  "Of these factors, the weight of the evidence is the least important, and the statute neither requires nor permits a pretrial determination of guilt."  Gebro, 948 F.2d at 1121.  The court may consider the weight of the evidence "only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or the community."  United States v. Motamedi, 767 F.2d 1403, 1408 (9th Cir. 1985).

In this case, the government has proffered a substantial body of evidence suggesting that Defendant killed Baldelli and attempted to cover up her disappearance.  The government referred to specific witnesses in Panama who recall observing  Defendant's repeated violence and threats toward Baldelli before her death, as well as the circumstances of her suspicious disappearance and Defendant's efforts to discard evidence and explain away his efforts.  The government identified by time, date, IP address, and content the various e-mails that Defendant allegedly sent to allay suspicion, and the time and location of his

withdrawals from her bank account.  It identified the machete Defendant allegedly used to dismember her and his later Facebook post asserting that he had only used it to cut up one stripper.  It identified the military-style duffle bag found with Baldelli's remains as the same duffle bag that appeared in the couple's pictures. It described the expert reports finding that the remains found in Panama are Baldelli's, based on DNA evidence, and that her body was dismembered using a machete.  And it identified the specific misrepresentations Defendant made to FBI agents, which appear to conflict with the government's evidence.

Defendant asserts that he "disputes much of the government's recitation," (Doc. No. 62 at 3 n.1), but at this point he has not proffered any contrary evidence or any other credible challenge to the accuracy or reliability of the government's proffers.

The court finds that the weight of the evidence against Defendant is considerable and strongly enhances Defendant's incentive to flee and any risk of danger he is to the community.

**C.    Defendant's History and Characteristics**

18 U.S.C. § 3142(g)(3) requires the court to consider the defendant's "history and characteristics," including "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings," and "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law." Id. § 3142(g)(3)(A)–(B).

Many aspects of Defendant's history and characteristics favor his release. He excelled in school, graduated from high school with highest honors, was a member of the National Honor Society, and volunteered in his community.  He served honorably in the Marine Corps for eight years, including two tours overseas,

served in the honor guard, was chosen to represent the Marines at important events attended by high-level dignitaries in Washington D.C., and garnered favorable reviews and numerous medals. After his honorable discharge he became a student and hoped to finish his undergraduate degree. He has significant ties to the community, as he has a wife and two young children in town, one of whom has a serious health condition; a mother in Michigan, who also has health concerns; and in-laws who are willing to guarantee his release with a $300,000 bond on their home. His wife and children know him only as a loving and devoted husband and father who has never shown any signs of abusing anyone. His only criminal history consists of a single misdemeanor DUI conviction, whose terms he appears to have successfully completed. He has no history of failing to appear for court proceedings, and he did not attempt to flee after his return to Panama although he knew he was under investigation.

Some considerations are neutral. Defendant has no financial resources of his own. Although that would likely make flight more difficult, that also means that he stands to lose little of his own property by absconding. It is not clear whether he was on parole for his DUI conviction when he was in Panama, so the court views this factor as neutral as well.

Other aspects of Defendant's history and characteristics favor detention. The government proffered witness statements that Defendant engaged in a pattern of violence toward Baldelli before her death and a calculated and stunningly creative pattern of manipulation and deception after her disappearance. Defendant is also a highly trained Marine who has a demonstrated ability and willingness to travel and function abroad. He appears to be highly intelligent, physically fit, sophisticated, capable, and socially adept.

On balance, the court finds that the characteristics favoring detention outweigh those favoring release. The court is not persuaded that Defendant's honorable (and commendable) service and his appearance in misdemeanor DUI

13cr2381 JM

proceedings accurately predict his future conduct, as those actions benefitted him at the time.  Now, by contrast, disobedience and flight are likely to appear attractive given his knowledge of the nature of the evidence against him and the significant length of the sentence he may face even without the possibility of murder charges.  The court is also not persuaded that Defendant's not fleeing while he was under investigation after his return to the United States accurately predicts his future conduct.  Then, unlike now, he did not know of the evidence against him, a conclusion suggested by his statements to the FBI.  Finally, the court is not persuaded that Defendant's ties to the local community are enough to keep him here, as he was willing to leave his now-wife and young daughter to go to Panama with Baldelli.  Given these considerations and Defendant's apparent propensity for self-preservation and deception, the court finds that Defendant is a serious flight risk.

**D.     Danger to the Community**

18 U.S.C. § 3142(g)(4) requires the court to consider "the nature and seriousness of the danger to any person of the community that would be posed by the person's release."  Defendant appears to have always maintained a peaceful existence in this country and with respect to his family.  That is a significant consideration, but one that is more than counterbalanced by the possible consequences Defendant faces on the current charges, the likelihood of a further murder charge, and his knowledge of the weight of the evidence.  Further, Defendant is physically fit and a trained Marine, and, based on the government's proffered evidence, he has both a strong drive for self-preservation and a capacity for violence in the context of this case.  When these characteristics are combined with a serious risk of flight, the court finds that Defendant clearly and convincingly poses a serious risk of danger to the community (or those who would attempt apprehension or to thwart flight).

**E.      Whether any Conditions Can Reasonably Assure Against These Risks**

Defendant asserts that he is willing to give up his passport and submit to GPS monitoring, a curfew, denial of use of the telephone, and any other conditions that will secure his release.  The problem, however, is that the lack of a passport, the presence of a GPS monitor, and the other conditions Defendant suggests do nothing to prevent flight and the risk of harm to others.  GPS monitors are not impossible to remove, and no passport is required to cross the border.  The court has no doubt that a highly trained, motivated, resourceful, and intelligent individual like Defendant would have little difficulty escaping under such conditions, and there does not appear to be sufficient motivation here to deter him from doing so.

Defendant asserts also that his wife and in-laws are willing to post a $300,000 bond secured by their real property to guarantee his release.  But the court is not convinced that even a very large sum of someone else's money provides sufficient incentive to assure Defendant's presence at future proceedings in these matters.  The court finds that no condition or set of conditions of release can reasonably assure Defendant's continued appearance in this matter or the safety of the community.

**F.      Interference with Preparation of the Defense**

Defendant asserts that his continued detention is interfering with his constitutional right to assist in the preparation of his own defense, in particular his ability to review the voluminous electronic discovery in this case.  (Doc. No. 45 at 5; Doc. No. 62 at 4–5.)  He relies on <u>Lopez-Valenzuela v. Arpaio</u>, --- F.3d ---, 2014 WL 5151625 (9th Cir. Oct. 15, 2014) (en banc), in which the Ninth Circuit recently emphasized the "profound" costs to the arrestee of pretrial detention and repeated the Supreme Court's statement that "the 'traditional right to freedom before conviction permits the unhampered preparation of a defense.'"  <u>Id.</u> at *7 (quoting <u>Stack v. Boyle</u>, 342 U.S. 1, 4 (1951)).  But <u>Lopez-Valenzuela</u> did not involve review of an individual detention order predicated upon the traditional

1  analysis required by <u>United States v. Koenig</u>, 912 F.2d 1190 (9th Cir. 1990),

2  and statutory authority.  Rather, the case invalidated <u>Arizona</u> law that categorically

3  denied bail to undocumented immigrants held on a wide range of enumerated

4  felonies.  Neither <u>Lopez-Valenzuela</u> nor any other authority requires, before

5  conviction, the right to preparation of a defense unhampered by pretrial detention.

6  **CONCLUSION**

7  Defendant's motion to revoke his detention (Doc. No. 45) is DENIED.

8  IT IS FURTHER ORDERED that Defendant is to remain committed to

9  the custody of the Attorney General or the Attorney General's representative for

10  confinement in a corrections facility separate, to the extent practicable, from persons

11  awaiting or serving sentences or being held in custody pending appeal.  Defendant

12  shall be afforded reasonable opportunity for private consultation with counsel.

13  While in custody, upon order of a court of the United States or on request

14  of an attorney for the Government, the person in charge of the corrections facility

15  in which Defendant is confined shall deliver Defendant to the United States Marshal

16  for the purpose of an appearance in connection with a court proceeding or any other

17  appearance stipulated to by counsel for the defense and for the United States.

18  IT IS SO ORDERED.

19  DATED:  November 21, 2014

20  _____

21  Hon. Jeffrey T. Miller
   United States District Judge

22

23

24

25

26

27

28

13cr2381 JM