1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                            Plaintiff,<br><br>    v.<br><br>BRIAN KARL BRIMAGER,<br><br>                         Defendant. | CASE NO. 13cr2381 JM<br><br>ORDER DENYING MOTIONS TO DISMISS THE FOREIGN MURDER CHARGE |

Defendant is charged, in count one of a second superseding indictment, with first degree foreign murder of a United States national, in violation of 18 U.S.C. § 1119. He has filed two motions to dismiss the murder charge. The first motion, (Doc. No. 91), asserts that § 1119 has been improperly and unconstitutionally charged because, in essence, Panama has "the ability" to secure his return within the meaning of § 1119(c)(2), which disqualifies the United States from prosecuting him in this case. The second motion, (Doc. No. 92), is based upon the argument that "§ 1119 is beyond Congressional authority." Both motions were fully briefed, and a hearing was held on August 10, 2015. For the reasons set forth below, both motions are denied.

**BACKGROUND**

According to the government, Defendant flew to Panama with Yvonne Baldelli in late September 2011.  Two months later, in late November, he allegedly killed her, dismembered and disposed of her body in a remote jungle area, and undertook to cover up her disappearance.  Among other things, the government alleges that Defendant used Baldelli's e-mail and bank accounts from outside the country to make it appear that she was still alive.  Defendant and Baldelli were both United States citizens.

In June 2013, Defendant was charged with obstruction of justice and making false statements to a federal officer.  (Doc. No. 1.)  That indictment was followed by a first superseding indictment in January 2014.  (Doc. No. 28.)

After further investigation, the government requested authorization from the Attorney General to prosecute Defendant for foreign murder under 18 U.S.C. § 1119.  Section 1119(c) provides that the government can prosecute a person who is a United States national for foreign murder only after receiving written approval from the Attorney General, Deputy Attorney General, or an Assistant Attorney General, who must have consulted with the Secretary of State and determined that the conduct took place in a country in which the accused is no longer present and that the country lacks the ability to lawfully secure his return.

On March 18, 2015, Assistant Attorney General Leslie R. Caldwell provided written authorization to prosecute Defendant for Baldelli's murder:

> I hereby approve prosecution of Brian Karl Brimager under 18 U.S.C. § 1119 for the killing of Yvonne Baldelli.  You may, in your discretion, prosecute Brimager for first degree or second degree murder, or for manslaughter.  Prior to approving prosecution, I have made the determinations required by subsection (c)(2) of the statute in consultation with the State Department Acting Legal Adviser, pursuant to the delegations of the Attorney General and the Secretary of State.

(Doc. No. 95, App. A.)  On April 17, 2015, the government filed the operative second superseding indictment, charging Defendant with first degree foreign murder, in addition to the earlier charges.  (Doc. No. 80.)

13cr2381

1

## DISCUSSION

2     The foreign murder statute, 18 U.S.C. § 1119, makes it a crime for one

3 United States national to kill another United States national in a foreign country.

4 In a subsection captioned "Offense," it defines the crime as follows:

5         A person who, being a national of the United States, kills or attempts
          to kill a national of the United States while such national is outside the
6         United States but within the jurisdiction of another country shall be
          punished as provided under sections 1111, 1112, and 1113.[1]

7

8 Id. § 1119(b).

9     The next subsection, captioned "Limitations on Prosecution," provides:

10        (1)  No prosecution may be instituted against any person under this
          section except upon the written approval of the Attorney General,
11        the Deputy Attorney General, or an Assistant Attorney General,
          which function of approving prosecutions may not be delegated.
12        No prosecution shall be approved if prosecution has been previously
          undertaken by a foreign country for the same conduct.

13
          (2)  No prosecution shall be approved under this section unless
14        the Attorney General, in consultation with the Secretary of State,
          determines that the conduct took place in a country in which the person
15        is no longer present, and the country lacks the ability to lawfully secure
          the person's return.  A determination by the Attorney General under
16        this paragraph is not subject to judicial review.

17 Id. § 1119(c)(1)–(2).

18    Defendant contends that the murder charge must be dismissed, and he

19 seeks an order requiring the government to produce its communications regarding

20 the decision to charge him.  The court addresses each of his substantive motions

21 in turn, beginning with the motion based on the argument that § 1119 was

22 unconstitutionally enacted.  The court will then analyze Defendant's claim that

23 the government has violated § 1119(c)(2) by proceeding with the murder charge.

24 ///

25

26    [1]  Section 1111 defines first and second degree murder and prescribes the
relevant punishments as death or imprisonment for life for first degree murder, or
27 imprisonment for any term of years or life for second degree murder.  See 18 U.S.C.
§ 1111(a)–(b).  Section 1112 defines voluntary and involuntary manslaughter and
28 prescribes terms of imprisonment for each of them.  See id. § 1112(a)–(b).  Section
1113 prescribes  penalties for attempted murder and manslaughter.  See id. § 1113.

## A.    Congressional Authority to Enact § 1119

Defendant contends that § 1119 is invalid because Congress did not have the power to enact it.  He points out that the Constitution gives Congress express authority to enact criminal laws in only a handful of areas—counterfeiting, piracy and felonies committed on the high seas, offenses against the law of nations, and treason.  See U.S. Const. art. I, § 8, art. III, § 3.  He argues that § 1119 does not fall into any of these enumerated categories and is not authorized by any of Congress's other express powers.  In broad strokes, he asserts that there was no constitutional foundation for Congress to enact this statute as part of the Violent Crime Control and Law Enforcement Act of 1994, in that § 1119 is not tethered to foreign commerce or treaty considerations, and it is not predicated upon the Necessary and Proper Clause.  It follows, Defendant asserts, that § 1119 can only be an exercise of general police power, which Congress does not have.

The government responds that Congress indeed possessed constitutional authority to enact § 1119 under its broad authority over external affairs and under the Foreign Commerce Clause and the cases interpreting these powers.  Defendant, in turn, contends that the government's arguments focus more upon the extraterritorial reach of the statute—a proposition not disputed by Defendant —rather than the constitutional validity of its enactment.

Defendant's constitutional challenge to § 1119 is facial, which is the most difficult challenge to mount successfully.  See United States v. Salerno, 481 U.S. 739, 745 (1987).  To succeed, he must establish that "no set of circumstances exists under which the Act would be valid."  Id.  "Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds."  United States v. Morrison, 529 U.S. 598, 607 (2000).

While it cannot be gainsaid that Congress possesses no plenary police power by which every type of legislation could be enacted, the principle of

13cr2381

enumerated powers "presupposes something not enumerated." United States v. Lopez, 514 U.S. 549, 566 (1995) (internal quotation marks omitted).  As Chief Justice Marshall wisely predicted, the extent of those granted powers will continue to be questioned "so long as our system shall exist." McCulloch v. Maryland, 4 Wheat. 316, 405 (1819).

### 1.    Congress's Implied Foreign Powers

The government proposes Congress's implied foreign powers as a constitutional basis for the enactment of § 1119, which in turn are predicated upon the nation's sovereignty and its power to assert jurisdiction over its own citizens. The government cites United States v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936), for the general principles articulated by the Supreme Court buttressing the federal government's powers in external affairs:

> The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs.  In that field, the primary purpose of the Constitution was to carve from the general mass of legislative powers *then possessed by the states* such portions as it was thought desirable to vest in the federal government, leaving those not included in the enumeration still in the states.  That this doctrine applies only to powers which the states had is self-evident.  And since the states severally never possessed international powers, such powers could not have been carved from the mass of state powers but obviously were transmitted to the United States from some other source.

Id. at 315–16 (citation omitted).  That other source, the Court explains later, is the nation's external sovereignty, which does not depend on affirmative grants of the Constitution and instead is "governed by treaties, international understandings and compacts, and the principles of international law." Id. at 318.

In United States v. King, 552 F.2d 833 (9th Cir. 1976), the Ninth Circuit held that Congress can exercise external jurisdiction to the full extent allowed by international law.  In King, the defendants had been convicted of distributing heroin in Japan intended for importation into the United States. See id. at 850.  They argued that the reach of the statute they were convicted under, which was expressly

1    aimed at extraterritorial conduct (the manufacture or distribution of a controlled

2    substance for the purpose of importation into the United States), exceeded the

3    power vested in Congress by the Constitution.  See id.

4         The Ninth Circuit rejected their argument.  It began by observing, "There

5    is no constitutional bar to the extraterritorial application of penal laws.  Numerous

6    decisions have upheld the authority of the United States to enact and enforce

7    criminal laws with extraterritorial effect."  Id. (citation omitted).  "From the body

8    of international law, the Congress may pick and choose whatever recognized

9    principle of international jurisdiction is necessary to accomplish the purpose sought

10   by the legislation."  Id. at 851.  The five recognized principles of international

11   jurisdiction, the court explained, are the territorial principle, which allows nations

12   to punish acts that produce detrimental effects within their borders; the nationality

13   principle, which is based on the nationality of the accused; the protective principle,

14   which authorizes nations to protect their interests and integrity; the universality

15   principle, which confers jurisdiction to punish offenses against the law of nations;

16   and the passive personality principle, which is based on the nationality of the

17   victim.  See id.; United States v. Layton, 509 F. Supp. 212, 215–16 (N.D. Cal. 1981)

18   (describing the five principles more fully).

19        Based on two of these principles, the nationality principle and the territorial

20   principle, the Ninth Circuit held that Congress had the power to punish the foreign

21   distribution of drugs destined for America because the defendants were United

22   States citizens and their activity was intended to, and did, have adverse effects in

23   the United States.  See King, 552 F.2d at 851–52.

24        The case of United States v. White, 51 F. Supp. 2d 1008 (E.D. Cal. 1997),

25   relied on these cases to hold that Congress had the power to enact § 1119, the

26   statute at issue here.  The defendant, who was accused of killing her son in Japan,

27   argued that Congress's enumerated powers did not give it authority to enact § 1119.

28   See id. at 1010–11.  The court relied on Curtiss-Wright, King, and another case,

1    United States v. Juda, 46 F.3d 961 (9th Cir. 1995), which had held that, "[u]nder

2    international law, a nation may generally assert jurisdiction over its citizens."

3    Id. at 967.  The court concluded:  "It is pellucid Congress possesses external

4    sovereignty authority to pass criminal laws proscribing its nationals' outlaw

5    conduct against other nationals abroad."  White 51 F. Supp. 2d at 1011.

6        Under the approach suggested by these cases, Congress indeed had the

7    power to enact § 1119 and extend its reach under the territorial and nationality

8    principles, if not others, because § 1119 makes it a crime for one American to kill

9    another American overseas.

10       Defendant dismisses these cases, arguing that Curtiss-Wright was about

11   delegation of powers, not Congress's power to enact extraterritorial penal laws,

12   and King and the cases like it are about the permissible reach of Congress's laws,

13   not its power to enact them in the first place.  Moreover, he argues, White must be

14   wrong because its approach leaves Congress dangerously unchecked, free to

15   criminalize such trivialities as jaywalking or littering abroad, or perhaps speaking

16   with a foreigner, the classic "slippery slope" refrain.

17       Defendant's doubts are misplaced.  While the language in Curtiss-Wright

18   is general and does not amount to a holding, the logic of King and similar cases

19   is relevant and compelling.  Yes, King, United States v. Clark, 435 F.3d 1100,

20   (9th Cir. 2006), and other cases discuss the concept of extraterritoriality.  But the

21   constitutional underpinnings for the respective statutes under scrutiny were also

22   addressed.  For example, in King, the court observes, "Numerous decisions have

23   upheld the authority of the United States to enact and enforce criminal laws with

24   extraterritorial effect."  552 F.2d at 850 (emphasis added) (citing cases).  Both

25   parties in King, as well as Defendant in this case, accepted "the same five principles

26   of extraterritorial authority generally recognized under international law," id.

27   at 851, including the territorial, nationality, protective, and passive personality

28   principles, all advanced by the government as relevant here.  King and the other

1  cases utilize the extraterritorial principles not only to justify the "reach" of a

2  statute, but also for the underlying rationale buttressing the constitutionality of

3  its enactment.

4       In <u>King</u>, the court observed that "[s]ince both [drug conspirators operating

5  in Japan were] United States citizens, the nationality principle would apply:

6  American authority over them could be based upon the allegiance they owe this

7  country and its laws if the statute . . . evinces a legislative intent to control actions

8  . . . [outside] the United States." <u>Id.</u> at 851.  The statute in <u>King</u> was applied to a

9  foreign drug conspiracy and upheld on the basis of the district court's application

10 of the nationality principle.  Here, § 1119 expressly and exclusively applies to the

11 <u>foreign</u> murder of one American by another American.  Nothing could more clearly

12 evince Congress's intent to apply the nationality principle as a constitutional

13 foundation for the statute.

14      <u>King</u> also sanctioned the territorial principle as justification for the

15 prosecution of the American drug conspirators operating in Japan:

16      Since appellants' activity in Japan was intended to, and did, have
   an actual adverse impact in the United States—the further distribution
17      of the heroin here—they can be held subject to American law as if they
   had acted within American territory.
18

19      We conclude that the jurisdictional reach of § 959 is properly within
   the scope of Congress's legislative power and that the statute is
20      constitutional as applied to appellants.

21 <u>Id.</u> at 852.

22      Extrapolating from <u>King</u>, it is clear that the territorial principle applies with

23 equal force here.  Defendant is charged with the murder of Yvonne Baldelli which,

24 if true, was an intentional act with actual adverse consequences in the United States,

25 *i.e.*, the substantial damage, loss, and harm sustained by the victim's family, friends,

26 and community.  It is also clear that the <u>King</u> court, rejecting an "as applied"

27 constitutional attack on § 959, would certainly have rejected a "facial" attack on

28 the statute.

     13cr2381

A fair reading of <u>King</u> is susceptible of only one conclusion:  utilizing the nationality principle or the territorial principle, § 949 was constitutionally applied in the prosecution of two United States citizens for their drug conspiracy activity in Japan.  Either of those two principles was sufficient for the extraterritorial authority in <u>King</u>.  <u>See</u> <u>Chua Han Mow v. United States</u>, 730 F.2d 1308, 1312 (9th Cir. 1984) ("Extraterritorial application of penal laws may be justified under any one of the five principles of extraterritorial authority.").

Similarly, § 1119 in this case may be justified by either the national or territorial principles that provide not only territorial reach but underlying constitutional validity to the statute.  For Defendant to use the "slippery slope" argument of an unchecked Congress running amok to criminalize foreign littering or jaywalking by an American misses the point in light of Defendant's <u>facial</u> challenge to § 1119.  Because the foreign murder statute exclusively criminalizes foreign murder, and not trivial offenses, it is soundly predicated on the national and territorial principles and would always be immune to a facial challenge.

The fundamental difficulty for Defendant is that he has not met his burden of showing that § 1119 is plainly and facially unconstitutional.  His argument that Congress's external powers must be tethered to enumerated powers or limited in the ways he claims is historically inaccurate and unsupported by legal analysis.

Defendant's arguments are clearly at odds with <u>United States v. Clark</u>, 435 F.3d 1100 (9th Cir. 2006).  In <u>Clark</u>, the defendant was convicted of traveling in "foreign commerce," <i>i.e.</i>, to a foreign country, to engage in a sexual act with a person under 18 years of age, in violation of 18 U.S.C. § 2423(c), a part of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today ("PROTECT") Act.  While holding that Congress properly utilized the Foreign Commerce Clause as constitutional authority for the enactment of § 2423(c), the court also observed that "expansive latitude" has been given to Congress over foreign commerce, and in a manner less restrained by power to regulate domestic

1   commerce.  Clark, 435 F.3d at 1102–03.

2           More relevant at this point of the analysis, however, is the government's

3   argument that the foreign murder statute is constitutional under Congress's broad

4   authority over external affairs, and what Clark has to say on that score.  In fact,

5   Clark strongly suggests that an alternative basis for upholding the constitutional

6   validity of § 2423(c) would have been Congress's plenary power over foreign

7   affairs had the argument been advanced by the government:

8           Our review of the constitutionality of § 2423(c) is focused on
            congressional authority under the Commerce Clause.  As pointed
9           out by the Government, the Supreme Court once remarked in a case
            involving the delegation of legislative power to the Executive that
10          "[t]he broad statement that the federal government can exercise no
            powers except those specifically enumerated in the Constitution, and
11          such implied powers as are necessary and proper to carry into effect the
            enumerated powers, is categorically true only in respect of our internal
12          affairs."  United States v. Curtiss-Wright Export Corp., 299 U.S. 304,
            315–16, 57 S. Ct. 216, 81 L. Ed. 255 (1936).  Standing alone, however,
13          this reference does not establish that the Foreign Commerce Clause
            has no meaning or is without bounds.  Nor does it necessarily mean
14          that congressional regulation of external affairs has no limits.  The
            Government has not argued—nor is there any indication in the
15          legislation—that Congress enacted § 2423(c) based on an implied
            foreign affairs power.  Cf. United States v. Hernandez–Guerrero,
16          147 F.3d 1075, 1077 (9th Cir.1998) (noting that in exercising
            immigration power, which falls into the arena of foreign affairs,
17          "Congress is not subject to the rigid constraints that govern its
            authority in domestic contexts").  Nonetheless, given our charge to
18          uphold the statute absent a plain showing that it is unconstitutional,
            United States v. Morrison, 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.
19          Ed. 2d 658 (2000), we acknowledge that Congress's plenary authority
            over foreign affairs may also provide a sufficient basis for § 2423(c).
20          See, e.g., Curtiss-Wright Export Corp., 299 U.S. at 315, 57 S.Ct. 216;
            United States v. Belmont, 301 U.S. 324, 331, 57 S.Ct. 758, 81 L.Ed.
21          1134 (1937) ("[C]omplete power over international affairs is in the
            national government . . . ").

22

23  Clark, 435 F.3d at 1109 n.14.

24          Here, the government has advanced, as a basis for § 1119's constitutionality,

25  Congress's plenary power over "external affairs," citing Curtiss-Wright as seminal

26  authority for its position, a position imbued with logic and common sense.  Simply

27  stated, if Congress can constitutionally proscribe foreign sexual exploitation of a

28  minor by a United States citizen as a function of its power over foreign affairs,

1   it may undoubtedly criminalize the murder of one American by another American

2   in a foreign country.  How else would such a perpetrator be held to answer?  No

3   individual state would have jurisdiction to prosecute the case, and foreign

4   prosecution would be problematic for many reasons.

5        For the foregoing reasons, this court holds that Congress's authority over

6   foreign affairs provides a constitutional basis for § 1119.  Moreover, to the extent

7   that the extraterritorial principles discussed above would lend not only foreign

8   reach to § 1119, but also serve as an independent constitutional basis for a statute's

9   enactment, as suggested by <u>King</u>, the principles of nationality and territoriality

10   serve to buttress the underlying constitutionality of § 1119.

11        **2.**     **The Foreign Commerce Power**

12        Alternatively, the government proposes that § 1119 is a valid exercise of

13   Congress's foreign commerce power because, in its view, one American killing

14   another American in a foreign jurisdiction inherently involves an element of

15   commerce.  It observes that courts have described Congress's foreign commerce

16   power as "sweeping" and "plenary." <u>Clark</u>, 435 F.3d at 1109.  It also points out,

17   as the Ninth Circuit has, that the Supreme Court's contraction of the interstate

18   commerce power in <u>United States v. Lopez</u>, 514 U.S. 549 (1995), and <u>United States</u>

19   <u>v. Morrison</u>, 529 U.S. 598 (2000), was driven by concerns about federalism and

20   states' rights, which have no bearing on the foreign commerce power.  <u>See</u> <u>Clark</u>,

21   435 F.3d at 1111–13.  "Although the Constitution, Art. I, § 8, cl. 3, grants Congress

22   power to regulate commerce 'with foreign Nations' and 'among the several States'

23   in parallel phrases, there is evidence that the Founders intended the scope of the

24   foreign commerce power to be greater." <u>Japan Line, Ltd. v. Cnty. of Los Angeles</u>,

25   441 U.S. 434, 448 & nn. 12–13 (1979).  "In fact, the Supreme Court has never

26   struck down an act of Congress as exceeding its powers to regulate foreign

27   commerce." <u>Clark</u>, 435 F.3d at 1113.

28   ///

Whether the foreign commerce clause can be a  basis for § 1119 is a matter of first impression.  The closest cases from this circuit appear to be United States v. Cummings, 281 F.3d 1046 (9th Cir. 2002), and Clark, 435 F.3d 1100, which was discussed in the previous section.

In Cummings, the Ninth Circuit held that Congress had authority under the foreign commerce power to enact the Parental Kidnapping Crime Act, which criminalizes the removal and retention of a kidnapped American child in a foreign country.  See 281 F.3d at 1050.  Cummings did not challenge the "removal" aspect of the statute, only Congress's authority to "criminalize the *retention* of an American child in a foreign country."  Id. at 1048.  The analysis relied on the ordinary commerce test from United States v. Lopez, under which Congress can regulate the use of channels of commerce, the instrumentalities of commerce or persons in commerce, and activities that have a substantial effect on commerce. See id. at 1049 (citing Lopez, 514 U.S. at 558–59).  Applying the Lopez test, the court held that the foreign commerce power gave Congress authority to prohibit the retention of children abroad because they had traveled in commerce before they were retained, and retaining them prohibited them from returning.  See id. at 1050 ("Not only does § 1204(a) target activity after the use of channels of foreign commerce is complete, but it also removes an impediment to the use of those channels.").

Along similar lines, in Clark, the Ninth Circuit held that Congress had authority under the foreign commerce clause to punish foreign commercial sexual activities with children that occurred within two months after the defendant's most recent travels.  See 435 F.3d at 1109–17.  But, rather than slavishly applying the Lopez test, the court in Clark simply asked whether there was a "rational relationship" or "rational nexus" with foreign commerce.  See id. at 1114, 1117. It concluded that there was the required nexus because the defendant had traveled in foreign commerce and he had paid the children for sex.  See id. at 1116.

13cr2381

1       Here there are no allegations that money changed hands, but Defendant's

2   alleged crime is otherwise similar to the crimes in <u>Cummings</u> and <u>Clark</u>.  The

3   government alleges that he flew to Panama with Baldelli and killed her two months

4   later.  Thus, he and Baldelli allegedly used the channels of foreign commerce

5   before the murder, and Baldelli's death prevented her from returning through those

6   channels.[2]  Thus, at least under Ninth Circuit standards, the nexus requirement

7   appears to be met.

8       Defendant objects that § 1119 has no explicit commerce requirement,

9   and, unlike crimes such as bank fraud and healthcare fraud, murder itself has no

10   inherent commercial element.  That is true.  However, Defendant does not address

11   or distinguish <u>Cummings</u> or <u>Clark</u> or explain why the Ninth Circuit's rational nexus

12   test is not met under the facts of this case.  Nor does he provide any meaningful

13   analysis of why foreign murder (as opposed to ordinary murder) has no inherent

14   commercial element.  Moreover, although he renews his objection that this approach

15   leaves Congress without limits, he does not develop that argument or provide any

16   authority discussing the issue.  Indeed, to the extent that his arguments reflect Judge

17   Ferguson's dissent in <u>Clark</u>, which raised similar concerns, the majority of a panel

18   of the Ninth Circuit has considered and rejected them.  <u>See</u> 435 F.3d at 1117–21.

19   Thus, Defendant has not plainly shown that Congress's foreign commerce power

20   cannot be a basis for § 1119.

21       Accordingly, Defendant's' motion to dismiss the foreign murder charge

22   because § 1119 exceeds Congress's powers is denied for all the reasons set forth

23   above.

24   **B.**    **The Extradition Treaty and Judicial Review**

25       Defendant also contends that § 1119 cannot be used because there is a valid

26   extradition treaty between the United States and Panama that includes murder as

27

28       [2]  Additionally, Defendant allegedly used the Internet and Baldelli's bank account to cover up her disappearance before he returned to the United States.

an extraditable offense.  He relies on § 1119(c)(2), which, as noted earlier, requires the Attorney General, in consultation with the Secretary of State, to determine that the country where the killing occurred "lacks the ability to lawfully secure the person's return."

However, the next sentence of the statute plainly prohibits the court from reviewing that determination.  See 18 U.S.C. § 1119(c)(2) ("A determination by the Attorney General under this paragraph is not subject to judicial review.").

Anticipating this, Defendant argues that he has a due-process right to judicial review of the Attorney General's determination under Apprendi v. New Jersey, 530 U.S. 466 (2000), Alleyne v. United States, — U.S. —, 133 S. Ct. 2151 (2013), and two immigration cases, United States v. Mendoza-Lopez, 481 U.S. 828 (1987), and United States v. Barajas-Alvarado, 655 F.3d 1077 (9th Cir. 2011).  In his view, these cases require judicial review because the determination increased the floor and the ceiling of the penalties he faces, and it will play a critical role in the mandatory-minimum life sentence he will receive if he is convicted.

These cases are entirely inapposite here.  Under Apprendi, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be treated as an element of the crime and must be submitted to a jury and proved beyond a reasonable doubt.  See 530 U.S. at 490.  Along similar lines, under Alleyne, any fact that increases the mandatory minimum sentence for a crime must be submitted to a jury.  See 133 S. Ct. at 2155.

Mendoza-Lopez recognized an alien's due-process right to collaterally attack an immigration judge's prior deportation order in a subsequent criminal proceeding for illegal reentry because the prior order was to be used to establish an element of the criminal offense.  See 481 U.S. at 838–39.  Barajas-Alvarado extended this holding to expedited removal orders, which Congress expressly precluded from judicial review.  See 655 F.3d at 1087.
///

13cr2381

Here, however, according to the plain terms of the statute, the Attorney General's determination is a limit on prosecution, not an element of the offense. See 18 U.S.C. § 1119(b) ("Offense")–(c) ("Limitations on Prosecution").  Further, the Attorney General's determination is not functionally an element of the offense, for purposes of Apprendi and Alleyne, because it does not increase the maximum or minimum sentence for the crime of foreign murder.  Certainly, the determination is a procedural prerequisite for what ultimately may lead to a conviction or sentence for murder, but only in the sense that it constrains the government's prosecutorial discretion to file the charge in the first place.  That is not the same kind of predicate these cases address.

Hence, this court agrees with the other courts that have held that the determination required by § 1119(c)(2) relates only to the prosecutor's discretion whether to prosecute, does not implicate due process under Apprendi, and is not reviewable.  See United States v. Wharton, 320 F.3d 526, 532–35 (5th Cir. 2003) ("[W]e find that preclusion from judicial review under § 1119(c)(2) does not violate Defendant's due process rights under the Fifth Amendment."); United States v. Nipper, 198 F. Supp. 2d 818, 820–21 (W.D. La. 2002) ("Whatever the rationale for the Attorney General's decision, it is not subject to the scrutiny of this court."); United States v. White, 51 F. Supp. 2d 1008, 1012 (E.D. Cal. 1997) ("Congress was well within its authority to repose the determination to prosecute exclusively with the Attorney General.").

Additionally, to the extent that the determination involves judgment of a foreign nation and its actual ability to secure the return of an American national under the circumstances of a particular case, Congress properly insulated it from judges or juries and reposed it in the Executive branch.  Defendant's motion to dismiss the murder charge on this basis is, therefore, denied.

///

///

13cr2381

C.    **Request for Discovery**

Last, Defendant requests an order under Federal Rule of Criminal Procedure 16 requiring the government to produce its communications underlying the decision to file the murder charge, so that it is possible to determine whether Panama has the ability to secure his return.

This request is denied.  The information Defendant seeks is not exculpatory because it does not relate to guilt or punishment, it is not relevant under the foregoing analysis, and it is not subject to disclosure under Rule 16.  <u>See</u> Fed. R. Crim. P. 16(a)(2); <u>Nipper</u>, 198 F. Supp. 2d at 821 & n.2 (describing a similar request as "sophistry").

<b>CONCLUSION</b>

Defendant's motions to dismiss the foreign murder charge, and for discovery of the government's communications, (Doc. Nos. 91 & 92), are DENIED.

IT IS SO ORDERED.

DATED:  August 18, 2015

_____
Hon. Jeffrey T. Miller
United States District Judge

13cr2381